RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
ALEXANDRIA, LOUISIANA
DATE 3/21/07
BY

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# ALEXANDRIA DIVISION

| | |
|---|---|
| **ROBERT MCGUIRE** | **CIVIL ACTION NO. 06-2178** |
| VS. | **JUDGE DRELL** |
| **CORRECTIONS CORPORATION OF AMERICA, ET AL.** | **MAGISTRATE JUDGE KIRK** |

## REPORT & RECOMMENDATION

Before the court is a civil rights complaint (42 U.S.C. §1983) filed *in forma pauperis* on November 13, 2006 by *pro se* plaintiff Robert McGuire. Plaintiff is an inmate in the custody of the Louisiana Department of Public Safety and Corrections. He is incarcerated at the Winn Correctional Center ("WCC"), in Winnfield, Louisiana. He names Secretary Richard Stalder, Corrections Corporation of America, WCC Warden Tim Wilkinson, Tim Keith, Dr. Pacheco, Lori Rodriguez, Pat Thomas, Kathy Richardson, Angie Davis, Sharon Rush, Mitzi Boyd Gaskill, Mary Fobbs, Carla Burke, LPN Mauterer, Corrections Officer Perot, Louisiana State Medical Center in Shreveport, and E.A. Conway Medical Center as his defendants. He prays for an injunction ordering WCC to properly treat Plaintiff's medical problems, and he seeks over 2.5 million dollars in compensatory damages.

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the court.

## STATEMENT OF THE CASE

Plaintiff alleges that, on March 10, 2005, he attended a scheduled appointment with Dr. Rodriguez at the WCC infirmary at which time a "heated argument" ensued. [Doc. #1-1, p.6]

Plaintiff was upset about the "duty status" that Rodriguez had prepared stating on one hand that Plaintiff could do no prolonged standing, but also medically clearing Plaintiff to be active in sports and physical activity as a form of treatment for pain in his "joints and muscles." [Doc. #1-1, p.6] Plaintiff claims that Rodriguez told him that she would do anything and everything to make sure Plaintiff did every job to which he was assigned; Rodriguez believed Plaintiff made sick calls only as a means of avoiding work. Plaintiff also claims that he complained to Asst. Warden Keith, who told Plaintiff that as long as the doctor says Plaintiff can work, he is expected to perform the work that he is assigned.

On April 11, 2005, Plaintiff made an emergency medical request due to pain in both legs and a swollen left ankle, but he was denied medical attention by Nurse Practitioner Richardson. [Doc. #1-1, p.7.]

Then, on June 4, 2005, Plaintiff was playing basketball when he severely injured his left knee. He was transported to E.A. Conway Medical Center for treatment. Plaintiff submits that E.A. Conway provided him with a prescribed full leg brace, but LPN Boyd-Gaskill took the brace away from Plaintiff when he returned to WCC. Plaintiff claims that the nurse took his leg brace to punish him for an argument they had on June 2, 2005 during pill call, when Plaintiff complained because the nurse was handing out medication without using gloves. [Doc. #1-1, p.7-8] Plaintiff claims that he was provided a knee support instead of a brace, which only aggravated his injury.

Due to the aggravation of the injury from the knee support, Plaintiff made a medical emergency call on the morning of June 5, 2005. LPN Burke elevated Plaintiff's leg to reduce the swelling, but when Plaintiff asked her to take the brace off, she told him "no." [Doc. #1-1, p.9]

On June 6, 2005, Plaintiff requested to see the doctor. He was examined by Nurse Richardson. She told him that he would see the doctor at his regularly scheduled appointment. On

June 7, 2005, Plaintiff was transported from the infirmary's medical ward to E.A. Conway for a "follow up" appointment with the orthopedic specialist. Plaintiff alleges that the first thing the specialist asked him was where his leg brace was. Plaintiff states that the doctor had his assistant cut the knee brace off of the plaintiff and that, upon examination, the doctor informed Plaintiff that the knee brace had been preventing proper circulation in his leg. [Doc. #1-1, p.11] The doctor ordered x-rays and an MRI and prescribed a wheelchair for Plaintiff's use until a proper diagnosis could be made.

On August 11, 2005, Plaintiff returned to E.A. Conway for a follow up appointment, where he learned that surgery would be the only course of treatment that could repair the damage to his knee. [Doc. #1-1, p.12] Plaintiff claims that, when he returned to WCC, Nurse Davis took Plaintiff's wheelchair from him. Nurse Davis told Plaintiff that the doctor said he did not need the wheelchair anymore. Plaintiff alleges that Nurse Davis then gave him two mismatched crutches to use instead of the wheelchair.

On April 2, 2006, during a physical therapy appointment, Plaintiff asked the therapist when his corrective surgery would be performed. According to Plaintiff, the therapist stated that WCC had refused to authorize the procedure due to the cost. [Doc. #1-1, p.14] The therapist then told Plaintiff that he would recommend a specialized knee brace designed for support and stability.

On May 8, 2006, Plaintiff filed a grievance against the medical department for delaying and denying proper treatment, including the recommended surgery.

On May 26, 2006, Plaintiff attended his final physical therapy appointment and the therapist said that he would again request that Plaintiff be provided with a special knee brace. On May 30, 2006, Plaintiff had an appointment at E.A. Conway where the doctor informed Plaintiff that his injuries were severe and that he would set up an appointment to have Plaintiff's leg measured for the

special brace. [Doc. #1-1, p.16] At a follow up appointment on June 22, 2006, Plaintiff informed the doctor that his measurements for the brace had never been taken. According to Plaintiff, the doctor informed him that Plaintiff had developed acute arthritis.

On July 10, 2006, Plaintiff was called to the infirmary to pick up his brace. However, when Plaintiff arrived, LPN Mauterer told him she could not find the brace. On July 12, Plaintiff submitted another grievance for not receiving prescribed medications.

On July 19, 2006, Plaintiff asked LPN Fobbs to try to locate the special brace in the infirmary. Plaintiff alleges that Fobbs walked to the front desk of the infirmary holding a package and that he overheard Fobbs read a note attached to the package that stated, "Do not give this brace to inmate Robert McGuire unless authorized by Pat Thomas, NP Richardson, or the Doctor." [Doc. #1-1, p. 20] Plaintiff claims that Fobbs then told Plaintiff there was no package there for him.

Next, Plaintiff alleges that he was called to the infirmary by RN Davies On August 2, 2006. He alleges that he was provided a ziplock bag containing an object, which Plaintiff was told was the leg brace that had been missing. According to Plaintiff, the bag contained a soft knee support rather than the brace that he had been prescribed. When Plaintiff informed the nurse that the knee support was not the same as a brace, he was told that he could leave it and sign a "refusal form" for refusing prescribed treatment. Plaintiff then asked to speak with the pharmacy tech who would have been the one to order the specialized brace. [Doc. #1-1, p.22]

Plaintiff asked the pharmacy technician, Ms. Rush, if she had ordered the knee support for him, and she stated that she had. Plaintiff complained that the support was not the same as the brace that had been prescribed. He reluctantly accepted the knee support and left the infirmary.

According to Plaintiff, on August 3, 2006, he spoke with Officer Perot, who asked Plaintiff if he had received his knee brace from Ms. Fobbs. Plaintiff showed Perot the knee support that he

had been given. Perot stated that the package that Fobbs had shown him contained an object that was bigger and longer than the soft knee support that Plaintiff was wearing. [Doc. #1-1, p.25]

On August 8, 2006, Plaintiff was awakened with pain, numbness, and stiffness in his left leg. He made a sick call request and was called to the infirmary on August 11, 2006. LPN Smith looked at Plaintiff's leg and determined that Plaintiff should see the doctor. Four days later, Plaintiff was evaluated by the doctor who "performed a partial evaluation" and changed Plaintiff's duty status to reflect fewer limitations. [Doc. #1-1, p.26]

On August 16, 2006, Plaintiff made another sick call due to "excruciating pain." He was called to the infirmary on August 18, 2006, and visually examined by LPN Burke. Plaintiff asked Burke if the request for authorization for his surgery had been acknowledged and Burke informed him that "corporate headquarters" had to make a determination regarding surgery, not WCC.

On August 22, 2006, Plaintiff was again awakened by numbness, pain, and stiffness in his leg. He was not allowed to see the doctor on that date. Plaintiff made an emergency sick call on August 25 for excessive pain and stiffness. LPN Williams prescribed 800 mg of Ibuprofen for pain. On August 29, Plaintiff filed another grievance regarding what he perceived to be inadequate medical care. Plaintiff's request was denied.

## LAW AND ANALYSIS

Plaintiff has named the Louisiana State Medical Centers in Shreveport ("LSUMC-S") and E. A. Conway LSU Medical Center in Monroe ("LSUMC-M") as two of many defendants. The LSU medical centers were established under the administration of the Board of Supervisors, and these medical centers cannot be distinguished from the Board of Supervisors, which is the operative arm of the medical center. (Article 8, section 7 of the Louisiana Constitution of 1974 created the Board of Supervisors and charged it with supervising and managing the institutions administered through

its system.) Therefore, the correct defendant is the Board of Supervisors rather than the individual hospitals, and any reference to the Board of Supervisors includes LSUMC-S and LSUMC-M. See Harris v. Louisiana State University Medical Center, 2006 WL 2054481, *1 (W.D. La. 2006).

The Board of Supervisors is an arm of the State of Louisiana and as such, is entitled to the protections of the Eleventh Amendment which bars a federal court from "entertain[ing] a suit brought by a citizen against his own State." Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)); Voisin's Oyster House, Inc. v. Guidry, 799 F.2d 183, 185-86 (5th Cir.1986). The State of Louisiana has not waived this sovereign immunity. See Edelman v. Jordan, 415 U.S. 651, 673 (1974). In short, LSUMC and E.A. Conway enjoy sovereign immunity, and it is recommended that Plaintiff's claims against these entities be dismissed on that basis.[1]

Plaintiff is being given the opportunity to amend his complaint to provide the court with additional information regarding all other defendants so that the court can determine the proper disposition of Plaintiff's remaining claims.

## CONCLUSION

For the reasons discussed herein, Plaintiff's claims against the Louisiana State University Medical Centers (LSUMC-S and E.A. Conway) should be DENIED and DISMISSED for failing to state a claim for which relief can be granted.

## OBJECTIONS

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's

---

[1] Furthermore, Plaintiff has alleged no wrongdoing on the part of either medical center.

objections within ten (10) days after being served with a copy thereof.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See **Douglass v. United Services Automobile Association**, 79 F.3d 1415 (5th Cir. 1996).

**THUS DONE AND SIGNED** in Chambers at Alexandria, Louisiana, this 21st day of March, 2007.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE